1  Katherine M. Dugdale, Bar No. 168014
   KDugdale@perkinscoie.com
2  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
3  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
4  Facsimile:  310.788.3399

5  William C. Rava (appearing *pro hac vice*)
   Christian W. Marcelo (appearing *pro hac vice*)
6  WRava@perkinscoie.com
   CMarcelo@perkinscoie.com
7  PERKINS COIE LLP
   1201 Third Avenue, Suite 4900
8  Seattle, WA  98101
   Telephone:  206.359.8000
9  Facsimile:  206.359.9000

10 Attorneys for Plaintiff
   Nintendo of America Inc.

11
                 UNITED STATES DISTRICT COURT
12
               CENTRAL DISTRICT OF CALIFORNIA
13

14

15 | NINTENDO OF AMERICA INC., a | Case No. 2:19-CV-07818-CBM-RAO |
   | Washington corporation | |

16 | | **NINTENDO'S MEMORANDUM OF** |
   | Plaintiff, | **POINTS AND AUTHORITIES IN** |
17 | | **SUPPORT OF ITS MOTION FOR** |
   | v. | **SUMMARY JUDGMENT** |
18
   | MATTHEW STORMAN, an | Date:        January 26, 2021 |
19 | individual, JOHN DOES 1-10, | Time:        10:00 a.m. |
   | individuals and/or corporations, | Ctrm:        #8B |
20
   | Defendant. | The Honorable Consuelo B. Marshall |
21

22

23

24

25

26

27

28

150041242.12

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................... 1

    A.   Nintendo, Its Business, and Its Intellectual Property Rights ............... 1

    B.   Mr. Storman's Infringing Activities ..................................................... 3

    C.   Nintendo's Investigation of RomUniverse ........................................... 6

    D.   Spoliation of Communications and Download Data ............................ 8

III. ARGUMENT ............................................................................................ 10

    A.   Mr. Storman Is Liable for Direct Copyright Infringement ................ 10

    B.   Mr. Storman Is Liable for Secondary Copyright Infringement ......... 11

        1.   Contributory Infringement ......................................................... 12

        2.   Vicarious Infringement .............................................................. 13

    C.   Mr. Storman Is Liable for Trademark Infringement .......................... 14

    D.   Nintendo Is Entitled to Recover Statutory Damages Under Both the Copyright Act and the Lanham Act ............................................... 17

    E.   Nintendo Seeks $15,610,000 In Statutory Damages for Mr. Storman's Willful Infringement ........................................................... 18

    F.   Attorneys' Fees Are Warranted .......................................................... 20

    G.   Permanent Injunction Is Warranted And Necessary ........................... 21

    H.   Mr. Storman's Counterclaim(s) Should Be Dismissed ...................... 23

    I.   Mr. Storman Despoiled Key Evidence ............................................... 23

IV.  CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

C**ASES**

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ........................................................................ 13, 14

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................................. 10

*BAOL, s.r.o. v. Media W. Entm't, Inc.*,
  No. CV1110138 RGK, 2012 WL 13012389 (C.D. Cal. June 26,
  2012) ....................................................................................................................... 20

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ............................................................................... 15

*China Cent. Television v. Create New Tech. (HK) Ltd.*,
  No. CV1501869 MMM, 2015 WL 12732432 (C.D. Cal. Dec. 7,
  2015) .......................................................................................................... 16, 17, 19

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) ............................................................................... 11

*eBay, Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) .............................................................................................. 21

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) ............................................................................... 10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) .............................................................................................. 10

*Fogerty v. Fantasy Inc.*,
  510 U.S. 517 (1994) .............................................................................................. 21

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ............................................................................. 12, 13

*Frank Music Corp. v. Metro-Goldwyn Mayer, Inc.*,
  886 F.2d 1545 (9th Cir. 1989) ............................................................................... 21

*Historical Research v. Cabral*,
  80 F.3d 377 (9th Cir. 1996) ................................................................................... 21

-ii-

1

2

# TABLE OF AUTHORITIES

**Page**

3

4

*In re Barboza*,
    545 F.3d 702 (9th Cir. 2008) ............................................................... 18

5

6

*Kepner-Tregoe, Inc. v. Vroom*,
    186 F.3d 283 (2d Cir. 1999) ................................................................ 18

7

8

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995) .................................................................. 18

9

10

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004) ........................................................................... 15

11

*MAI Sys. Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993) ............................................................... 22

12

13

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ........................................................................... 12

14

15

16

*Mfg. Automation & Software Sys., Inc. v. Hughes*,
    No. CV 16-8962 CAS (KSX), 2018 WL 5914235 (C.D. Cal. Sept.
    18, 2018) .......................................................................................... 25

17

*Micro Star v. Formgen Inc.*,
    154 F.3d 1107 (9th Cir. 1998) ............................................................. 11

18

19

20

*Microsoft Corp. v. Buy More, Inc.*,
    136 F. Supp. 3d 1148 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476
    (9th Cir. 2017) ........................................................................ 21, 22, 23

21

22

*Microsoft Corp. v. Nop*,
    549 F. Supp. 2d 1233 (E.D. Cal. 2008) ................................................. 22

23

24

*Moroccanoil, Inc. v. Groupon, Inc.*,
    278 F. Supp. 3d 1157 (C.D. Cal. 2017) ................................................. 16

25

26

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*,
    40 F.3d 1007 (9th Cir. 1994) ............................................................... 18

27

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ............................................................. 12

28

150041242.12

# TABLE OF AUTHORITIES

**Page**

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
213 F. Supp. 2d 1146 (C.D. Cal. 2002) ............................................................. 10

*Philip Morris USA Inc. v. Liu*,
489 F. Supp. 2d 1119 (C.D. Cal. 2007) ................................................. 18, 20, 21

*Playboy Enter., Inc. v. Baccarat Clothing Co.*,
692 F.2d 1272 (9th Cir. 1982) ............................................................................ 21

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
793 F.2d 1132 (9th Cir. 1986) ............................................................................ 22

*Sega Enters Ltd. v. MAPHIA*,
948 F. Supp. 923 (N.D. Cal. 1996) .............................................................. passim

*Sega Enters Ltd. v. Sabella*,
No. C 93-04260 CW, 1996 WL 780560 (N.D. Cal. Dec. 18, 1996) ................... 13

*Sennheiser Elec. Corp. v. Eichler*,
No. CV 12-10809 MMM, 2013 WL 3811775 (C.D. Cal. July 19,
2013) .............................................................................................................. 22, 23

*To v. Nguyen*,
No. SACV070989 JVS, 2008 WL 11340345 (C.D. Cal. May 28,
2008) .................................................................................................................... 20

*Toho Co., Ltd. v. William Morrow and Co., Inc.*,
33 F. Supp. 2d 1206 (C.D. Cal. 1998) ................................................................ 15

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993) ............................................................................. 18

*World Courier v. Barone*,
No. C 06-3072 TEH, 2007 WL 1119196 (N.D. Cal. Apr. 16, 2007) ............ 23, 24

*Zosma Ventures, Inc. v. Nazari*,
No. CV121404 RSWL (FFMx), 2013 WL 12129643, at *4 (C.D.
Cal. Sept. 23, 2013) ............................................................................................ 21

## STATUTES

15 U.S.C. §1057(b) ................................................................................................... 15

-iv-

150041242.12

# TABLE OF AUTHORITIES

**Page**

15 U.S.C. § 1114(1) ................................................................................................. 15

15 U.S.C. § 1114(1)(a) .......................................................................................... 15

15 U.S.C. §§ 1116(a) and 1125(c)(1) .................................................................. 21

15 U.S.C. § 1117(a) ................................................................................................ 21

15 U.S.C. §1117(b) ................................................................................................. 18

15 U.S.C. § 1117(c) ................................................................................................ 17

17 U.S.C. § 106(1) .................................................................................................. 12

17 U.S.C. § 106(1), (3) .......................................................................................... 10

17 U.S.C. § 410(c) .................................................................................................. 11

17 U.S.C. § 501 ....................................................................................................... 10

17 U.S.C. § 501(a) .................................................................................................. 10

17 U.S.C. § 502(a) .................................................................................................. 21

17 U.S.C. § 504(c) .................................................................................................. 17

17 U.S.C. § 504(c)(1) ............................................................................................. 17

17 U.S.C. § 504(c)(2) ............................................................................................. 10

17 U.S.C. § 505 ....................................................................................................... 20

Copyright Act ................................................................................................. passim

Lanham Act ..................................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 .................................................................................................. 10

150041242.12

1

## I.   INTRODUCTION

2   This is a straightforward video game piracy case, and the material facts are

3   undisputed.  For over a decade, defendant Matthew Storman owned and operated

4   the website RomUniverse.com.  He populated the website with pirated copies of

5   thousands of different Nintendo games and distributed *hundreds of thousands* of

6   copies of those pirated games.

7   There is no dispute that many of the pirated games which Mr. Storman

8   uploaded and distributed infringed Nintendo's copyrights and trademarks.

9   Mr. Storman does not dispute Nintendo's ownership or the validity of its relevant

10   intellectual property, and the undisputed evidence demonstrates massive,

11   intentional, years-long infringement from which Mr. Storman directly profited.

12   It gets worse.  After refusing and then being ordered to produce key

13   evidence, Mr. Storman instead destroyed it.  That evidence included

14   communications with his website administrators and data showing how many times

15   each of the pirated video games had been downloaded.  *This information*

16   *disappeared mere days after Judge Oliver ordered Mr. Storman to produce it.*

17   On the record before the Court, there is no question that Mr. Storman is liable

18   for direct and secondary copyright infringement as well as trademark infringement.

19   Nintendo is therefore entitled to summary judgment as a matter of law.

20   Additionally, because of the destruction of key evidence, Nintendo seeks an adverse

21   inference regarding the missing data.

22   This motion is supported by the Declarations of Jacqueline Knudson

23   ("Knudson Decl."), Alicia Bell ("Bell Decl."), and Christian Marcelo ("Marcelo

24   Decl."), as well as the records and files related to this matter.

25

## II.   STATEMENT OF FACTS

26   **A.   Nintendo, Its Business, and Its Intellectual Property Rights**

27   Nintendo develops, markets, and distributes electronic video game hardware,

28   software, and related accessories.  Knudson Decl. ¶ 2.  Nintendo's innovation in

-1-

these areas has made it a world-famous brand, known for its fun video games and beloved video game characters. *Id.*

Since at least as early as 1980, Nintendo began using video games to introduce the world to characters that would soon become some of the most famous and beloved characters of all time. *Id.* These characters, examples of which are shown below, include household names such as Mario, Luigi, Donkey Kong, Yoshi, Link, Princess Zelda, and many, many more. *Id.*



Nintendo's immense and widespread popularity is reflected in the massive volumes of sales of its video games and consoles dating back to the release of the Nintendo Entertainment System in 1984.[1] And Nintendo's popularity has only increased over the years.

Nintendo built its business through creative and financial investment in its video games, products, and intellectual property. As part of this investment, Nintendo owns registered United States copyrights for a variety of Nintendo video games, video game characters, and related works. These registrations include registrations for the copyrighted works identified in Exhibit A to Nintendo's Complaint (the "Nintendo Copyrights"). *Id.*, Exs. 1-2 (copyright registrations) pp. 5-142. Nintendo also owns registered United States trademarks covering these offerings (the "Nintendo Trademarks," collectively with the Nintendo Copyrights, the "Nintendo IP"). *Id.*, Ex. 3 (trademark registrations) pp.143-221; Compl., Ex. B. Mr. Storman does not dispute Nintendo's ownership or the validity of the Nintendo IP. Marcelo Decl., Ex. 1 (Storman Dep.) pp. 66-67 at 63:25-64:20.

---

[1] For example, the Nintendo 3DS, released in 2011, enjoyed sales of over 75 million consoles and over 385 million games. Knudson Decl. ¶ 3. Most recently, the Nintendo Switch (released in 2017) has seen sales of over 68 million consoles and over 450 million games. *Id.*

150041242.12

**B.    Mr. Storman's Infringing Activities**

Nintendo's popularity has made it a frequent target for intellectual property pirates, including Mr. Storman.  Video game pirates often make unauthorized copies of video games by copying the "read-only memory files" or "read-only memory images," commonly referred to as "ROMs," found in a genuine game cartridge or disc.  Knudson Decl. ¶ 6; Marcelo Decl., Ex. 1, pp. 29-31 at 26:12-28:1.  Such pirated copies can be played on unauthorized devices, such as personal computers, through software (an emulator) designed to mimic the functionality of a physical video game system.  *Id*.  Some pirated ROMs can also be played on Nintendo hardware using hacking techniques.  *Id*.

In or around 2009, Mr. Storman purchased the domain name and website located at NDSUniverse.com ("NDSUniverse").  Marcelo Decl., Ex. 1, pp. 15-16 at 12:25-13:6.  At that time, NDSUniverse distributed pirated ROMs of games for Nintendo's DS console.  *Id.* pp. 19-21 at 16:6-18.  Soon after, Mr. Storman purchased the domain name RomUniverse.com, repurposed the NDSUniverse website into a new website located at RomUniverse.com, and redirected traffic from NDSUniverse to the website associated with RomUniverse.com ("RomUniverse").  *Id.* pp. 16-18 at 13:10-15:13.  Through RomUniverse, Mr. Storman began distributing pirated ROMs, primarily for Nintendo's consoles. *Id.* pp. 30-32 at 27:24-29:1.  Since purchasing the RomUniverse domain in or around 2009, Mr. Storman has been and currently is the sole owner of, and solely responsible for the content at, RomUniverse.  *Id.* p. 18 at 15:21-25.

Prior to and throughout most of this litigation, RomUniverse distributed pirated ROMs of thousands of Nintendo games, including pirated ROMs of games for the Super Nintendo Entertainment System (Super NES), Nintendo Entertainment System (NES), Game Boy, Game Boy Advance, Game Boy Color, Nintendo 64, Nintendo DS, Nintendo 3DS, Wii, and the Nintendo Switch.  *Id.* pp. 30-32 at 27:24-29:1; Marcelo Decl., Ex. 2, pp.106-109.  These pirated ROMs were

labelled and organized using Nintendo's trademarks to allow RomUniverse users to quickly locate the pirated games. Marcelo Decl., Ex. 1, pp. 37-38 at 34:8-35:11; *id.* p. 92 at 89:19-22; Marcelo Decl., Exs. 2-5, pp.104-123; Bell Decl. Ex. 3 pp. 9-142; Knudson Decl., Ex. 5, p. 223 (Mr. Storman explaining a new category will "make[] it easier for the public to find specific ROMs").[2]

Mr. Storman and his website administrators populated RomUniverse with this catalogue of pirated ROMs. Mr. Storman uploaded numerous pirated ROMs himself. Marcelo Decl., Ex. 1, pp. 39-42 at 36:20-39:18; Knudson Decl., Ex. 7, p. 225. Mr. Storman found these ROMs on other websites distributing pirated content. *Id.* He concedes that many of the ROMs he uploaded were identified as ROMs of Nintendo games, and he believed them to be such before uploading them to RomUniverse. *Id.* On several occasions, Mr. Storman responded to user requests by locating specific pirated ROMs and uploading them to RomUniverse. Marcelo Decl., Ex. 1, pp. 90-92 at 87:25-89:4; Knudson Decl., Ex. 7, p. 225. He also had the ability and authority to control the actions of RomUniverse administrators in connection with the content and functionality of RomUniverse and was responsible for the content they uploaded. Marcelo Decl., Ex. 1, pp. 43-44 at 40:19-41:7; *id.* pp. 98-100 at 95:9-97:14.

When Nintendo filed its Complaint in September 2019, RomUniverse claimed to offer pirated ROMs of more than 3000 Nintendo 3DS games and pirated ROMs of 247 Nintendo Switch games, impacting Nintendo's most recently released consoles. Marcelo Decl., Ex. 3, pp. 114-16. And according to RomUniverse, at that time, it had supported and facilitated more than 400,000

---

[2] The "Admin" account seen in Exs. 5-7 attached to the Knudson Decl. belonged to Mr. Storman and no one else had access to the account. Marcelo Decl., Ex. 1, pp. 79-80 at 76:10-77:10.

downloads of pirated ROMs of Nintendo 3DS games and 300,000 downloads of pirated ROMs of Nintendo Switch games.[3]  *Id.*

Mr. Storman directly profited from this infringing activity by selling "Premium Memberships" for between $28 and $60 for either annual or lifetime memberships.  Marcelo Decl., Ex. 1, pp. 51-52 at 48:3-49:17; Knudson Decl. Ex. 6, p. 224.  Non-paying users were limited to one free download; Premium Members could download an unlimited number of pirated ROMs at higher speeds than non-paying users.  Marcelo Decl., Ex. 1, pp. 44-45 at 41:8-42:13.  Additionally, Mr. Storman provided gift giveaways to RomUniverse Premium Members, including gifting a Nintendo 3DS console to a Premium Member (presumably to play the pirated content).  *Id.* pp. 48-49 at 45:19-46:6.  Mr. Storman promoted Premium Memberships by highlighting RomUniverse's vast array of pirated ROMs for Nintendo games, noting that RomUniverse offered "1000s of game roms … [i]ncluding Switch, Wii, 3DS/DS, GBA and more."  *Id.* pp. 56-57 at 53:18-54:17; Marcelo Decl., Ex. 16, pp. 222-23.  Since 2016, Mr. Storman received at least $77,700 in payments for Premium Memberships.  *Id.*, Ex. 8 (Interrogatory Response No. 1) p. 140; Ex. 9, p. 151.[4]

Mr. Storman used the available pirated Nintendo content to promote RomUniverse in other ways too.  On June 24, 2019, Mr. Storman posted a Tweet stating:  "Hey you. You know we have Nintendo Switch Scene Roms. They're uploaded when they are dumped. Check them out."[5]  Marcelo Decl., Ex. 10, p. 159;

---

[3] Soon after Nintendo filed its Complaint—which specifically referenced this data (Compl. ¶ 33)—Mr. Storman removed it from the website.  Marcelo Decl., Ex. 1, pp. 60-61 at 57:9-58:21; pp. 63-65 at 60:7-62:2; compare Marcelo Decl., Ex. 2 (9/12/2019 RomUniverse screenshot) pp.104-110 and Ex. 3 (screenshot of 3/18/2019 archive of RomUniverse) pp.114-16 with Ex. 6 (9/13/2019 RomUniverse screenshot) pp.125-131.

[4] In interrogatory responses, Mr. Storman claimed to have owned RomUniverse only since 2016 and provided financial information from that time.  Marcelo Decl., Ex. 9, p. 152 (Rog. 8).  However, in his deposition, Mr. Storman admitted he has owned RomUniverse since 2009 and has been charging membership fees since at least 2010.  Marcelo Decl., Ex. 1 pp. 50-51 at 47:25-48:2.  His total income from Premium Memberships is thus likely significantly greater than he disclosed.

[5] "Dumping" refers to the creation of the ROM by making an illegal copy of the game.

150041242.12

Marcelo Decl., Ex. 1, pp. 34-36 at 31:2-33:17.  He also used a third-party service, Discord[6], to notify RomUniverse users when new, pirated content was available and boasted of RomUniverse's vast catalogue of pirated ROMs of Nintendo games.  *Id.*, pp. 76-77 at 73:23-74:2; *see also* Knudson Decl., Ex. 4, p. 222.

Under Mr. Storman's control and management, RomUniverse attracted hundreds of thousands of users each year, resulting in hundreds of thousands of downloads of pirated ROMs of Nintendo games.  Marcelo Decl., Exs. 11-12, pp.161-162.  RomUniverse also grew dramatically in recent years, coinciding with the release of the Nintendo Switch console and related games.  In 2016, RomUniverse had over 200,000 users and nearly 2 million pageviews.  *Id.*  By 2019, just two years after the Nintendo Switch release, RomUniverse traffic had *tripled*, with over 600,000 users and over 7 million pageviews.  *Id.*

**C.    Nintendo's Investigation of RomUniverse**

In its Complaint, Nintendo provided a list of 37 Nintendo games to which it owns valid, enforceable copyrights (the "Nintendo Games"), as well as the box art corresponding with 12 of those games (the "Nintendo Box Art").  Compl. Ex. A.  Pirated ROMs of each of the 37 Nintendo Games—among thousands of other games for Nintendo consoles—were available for download from RomUniverse (the "Infringing ROMs").  Bell Decl., ¶¶ 7-10; *id.*, Ex. 2, p. 8.  On April 30, 2019, Nintendo retained the law firm Miller Nash Graham & Dunn LLP ("Miller Nash") to gather evidence related to RomUniverse.  Bell Decl., ¶ 2.  Miller Nash downloaded each of the Infringing ROMs from RomUniverse, documenting the process.  *Id.* ¶¶ 2-12.  Nintendo's investigation confirmed five important points.

*First*, RomUniverse identified and categorized the Infringing ROMs using one or more of the Nintendo Trademarks.  *Id.*, Ex. 3 (screenshots relating to

---

[6]  Discord is an online communication service provider located at Discord.com where users communicate in private chats via voice calls or text messaging, and send media and files.

150041242.12

Infringing ROMs), pp. 9-142; Marcelo Decl., Ex. 2 pp. 104-111; Knudson Decl., Ex. 3 (trademark registrations), pp.143-221.

*Second*, the download page on RomUniverse for 12 of the Infringing ROMs used the Nintendo Box Art to promote the Infringing ROM.  Bell Decl., Ex. 3[7]; Knudson Decl., Ex. 2 (copyright registrations), pp. 110-142.

*Third*, at the time they were downloaded, all but three of the Infringing ROMs were functional copies of the games listed in Exhibit A to Nintendo's Complaint.  Bell Decl., Ex. 2, pp. 8.  Nintendo was able to load and launch these Infringing ROMs and thus play pirated copies of the respective Nintendo Games. *Id.*  Nintendo owns copyright registrations for each of these video games.  Knudson Decl., Ex. 1 (copyright registrations) pp. 5-109.

*Fourth*, when launched, the title page for most of the Infringing ROMs displayed one or more of the Nintendo Trademarks, including in many cases, the world-famous NINTENDO design and word mark.  Bell Decl., Ex. 3, pp. 9-142. Again, Nintendo owns trademark registrations for those trademarks.  Knudson Decl., Ex. 3, pp.123-221.

*Fifth*, according to RomUniverse, which Mr. Storman alone owns and controls, at or around the time Nintendo completed its investigation, nearly 50,000 copies of the Infringing ROMs had been downloaded through RomUniverse.  Bell Decl., Ex. 3, pp. 9-142; Marcelo Decl., Ex. 1, p. 14 at 11:17-21.

Nintendo's litigation provided Mr. Storman with unequivocal notice that RomUniverse offered pirated Nintendo content.  Yet, Mr. Storman continued to operate RomUniverse and, most significantly, *continued to upload new pirated ROMs of Nintendo games for over a year after the lawsuit was filed.*  Knudson Decl. ¶ 7.  During this time, he also used RomUniverse to attempt to crowdfund his legal defense, asking for donations to keep RomUniverse up and infringing.

---

[7] *See* pp. 17, 25, 29, 33, 37, 41, 45, 53, 58, 66, 131, and 138.

150041242.12

1   Marcelo Decl., Ex. 7, p. 225.  As recently as mid-September 2020, a pirated ROM
2   of Nintendo's newly-released and immensely popular *Super Mario 3D All-Stars*
3   video game was uploaded to RomUniverse, and RomUniverse users were notified
4   of this new content via Discord.  Knudson Decl. ¶ 7.

5   **D.    Spoliation of Communications and Download Data**

6          On June 23, 2020, Nintendo reached out to Mr. Storman concerning three
7   categories of documents he failed to produce in response to Nintendo's discovery
8   requests:  (1) his tax information, (2) data regarding the number of downloads of
9   the Infringing ROMs, and (3) communications regarding RomUniverse and this
10  litigation.  A month later, Mr. Storman responded that he had a medical issue and
11  requested an extension of the case schedule to allow him to recover.  Marcelo Decl.,
12  Ex. 13, pp. 163-165.  Nintendo agreed to this extension.

13         On August 5, 2020 on the parties' stipulation, the Court extended the case
14  schedule and further ordered the parties to participate in the Informal Discovery
15  Conference procedure ("IDC"), including a preceding substantive meet-and-confer
16  by no later than September 25, 2020.  Dkt. No. 42.  Thereafter, Nintendo attempted
17  to contact Mr. Storman on numerous occasions, including by email and via
18  telephone on August 17, August 21, August 28, September 4, and September 11,
19  2020.  Marcelo Decl., Ex. 13, pp. 188-190.  Mr. Storman did not respond.  *Id.*

20         In violation of the Court's August 5 Order (Dkt. No. 42), Mr. Storman did
21  not participate in a meet-and-confer with Nintendo.  Marcelo Decl. ¶ 2.

22         On September 25, 2020 the parties participated in an IDC regarding these
23  discovery disputes.  At the conclusion of the hearing, Magistrate Judge Oliver
24  ordered Mr. Storman to produce the requested documents by no later than
25  October 5, 2020 and warned him that his failure to comply with his discovery
26  obligations could result in sanctions.  Dkt. No. 45 ("September 25 Order").

27         On September 30, 2020, the parties conferred about the status of Mr.
28  Storman's compliance with his discovery obligations and the Court order.  Marcelo

-8-

Decl. ¶ 3, Ex. 14, pp. 217-19.  During that conference, Mr. Storman represented that he was on track to produce documents responsive to each of the three document categories, and that, specifically, the data regarding the downloads was available to him.  *Id.*  Additionally, regarding the download data and in connection with Mr. Storman's agreement to disable RomUniverse, the parties discussed—and Mr. Storman specifically confirmed—that this data was and would remain accessible.  *Id.*; Marcelo Decl., Ex. 1, p. 81 at 78:7-19.

While Mr. Storman produced some tax records, he did not produce any responsive documents regarding download data or communications by the October 5 deadline.  Two days later, on October 7, 2020, Mr. Storman informed Nintendo that he no longer had access to (a) his communications sent and received through Discord and (b) the data on his website regarding the number of downloads of the Infringing ROMs.  *Id.*, Ex. 15, p. 220.  Mr. Storman could not provide an explanation as to why he could not access this data.  Marcelo Decl., Ex. 1, pp. 78-82 at 75:18-79:8.  He did, however, confirm that the now-lost communications included private messages regarding Nintendo, this litigation, and the website generally.  *Id.*, pp. 22-26 at 19:11-20:3; 21:13-23:13.

Mr. Storman testified that he did not even begin to attempt to collect the required documents until after the Court-ordered deadline because he "procrastinated."  *Id.*, pp. 79-82 at 75:18-79:8.  This data is now unrecoverable.  Thus, at the conclusion of another IDC, the Court found that Mr. Storman had violated the Court's September 25 Order by not producing the data and "again explained to [Mr. Storman] that he could be sanctioned for non-compliance with past orders and this order, including by being ordered to pay Plaintiff's costs incurred in securing [Mr. Storman]'s compliance with his discovery obligations, by allowing an adverse inference and/or giving an adverse instruction, and/or through a terminating sanction."  Dkt. No. 49 (October 28 Order).

150041242.12

### III.   ARGUMENT

Summary judgment is appropriate where, as here, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "If the party moving for summary judgment meets its initial burden of identifying for the Court the portions of materials on file which it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on mere allegations in the pleadings in order to preclude summary judgment."  *Sega Enters Ltd. v. MAPHIA*, 948 F. Supp. 923, 931 (N.D. Cal. 1996).  Cases such as this one, where there is no dispute that the defendant engaged in the infringing activity, are particularly well-suited for summary judgment.

### A.   Mr. Storman Is Liable for Direct Copyright Infringement.

The Copyright Act gives the copyright owner the exclusive right to reproduce a copyrighted work and to distribute copies of the work.  *See* 17 U.S.C. § 106(1), (3).  To establish its claim for copyright infringement, Nintendo must prove:  (a) that it owns valid copyrights in the works; and (b) that Mr. Storman infringed Nintendo's exclusive rights.  *See* 17 U.S.C. § 501; *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997); *Sega v. MAPHIA*, 948 F. Supp. at 931.  Mr. Storman's knowledge or intent is irrelevant to liability, although here it is clear his infringement was willful.  *See* 17 U.S.C. § 501(a); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1166 (C.D. Cal. 2002).[8]

In this case, there is no dispute as to either element:  (a) Nintendo owns the copyrights in the Nintendo Copyrights; and (b) Mr. Storman distributed infringing copies of the Nintendo Games (the Infringing ROMs) and used unauthorized copies

---

[8]  A court may, however, consider a party's state of mind in determining whether to enhance statutory damages or to award attorneys' fees.  *See* 17 U.S.C. § 504(c)(2).

150041242.12

of the Nintendo Box Art to promote the Infringing ROMs.  *See* Section II(C), *supra*.

Nintendo establishes the first element by providing its copyright registration certificates for the Nintendo Copyrights.  Knudson Decl., Exs. 1-2.  These registration certificates are prima facie evidence of Nintendo's ownership of valid copyrights, *see* 17 U.S.C. § 410(c), and Mr. Storman does not dispute Nintendo's ownership.  Marcelo Decl., Ex. 1, pp. 66-67 at 63:25-64:20.  Nintendo has therefore satisfied the ownership element.  *See Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998) ("copyright registration creates a presumption of ownership").

It is also undisputed that Mr. Storman trafficked infringing copies of the Nintendo Games, including by uploading them to and distributing them through RomUniverse.  Marcelo Decl., Ex. 1, pp. 39-42 at 36:20-39:18; *id.* pp. 90-92 at 87:25-89:4; Bell Decl., Ex. 2, p. 8.  Likewise, there is no question that Mr. Storman displayed copies of the Nintendo Box Art to promote the download of the Infringing ROMs.  Bell Decl., Ex. 3;[9] Knudson Decl., Ex. 2, pp. 110-142.  Having uploaded and distributed unauthorized and infringing copies of the Nintendo Games, and uploaded and displayed the Nintendo Box Art to promote the distribution of these pirated game copies, Mr. Storman infringed Nintendo's exclusive rights under the Copyright Act and is liable as a matter of law for copyright infringement.  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) ("Both uploading and downloading copyrighted material are infringing acts.  The former violates the copyright holder's right to distribution, the latter the right to reproduction.").

## B.   Mr. Storman Is Liable for Secondary Copyright Infringement

There is no dispute that Mr. Storman has both contributorily and vicariously infringed Nintendo's rights under the Copyright Act.  "[O]ne infringes

---

[9] *See* pp. 17, 25, 29, 33, 37, 41, 45, 53, 58, 66, 131, and 138.

150041242.12

contributorily by intentionally inducing or encouraging direct infringement . . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).

### 1. Contributory Infringement

To establish liability for contributory infringement, Nintendo need only show that "the users of [RomUniverse] directly infringed [Nintendo's] copyright" and that "with knowledge of the users' infringing activity … [Mr. Storman] induced, caused, or materially contributed to their infringing activity." *See Sega v. MAPHIA*, 948 F. Supp. at 932 (granting summary judgment finding willful contributory copyright infringement). "[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).

First, there is no dispute that users who downloaded the Infringing ROMs in fact downloaded unauthorized copies of the Nintendo Games and thus infringed Nintendo's exclusive rights of reproduction under the Copyright Act. 17 U.S.C. § 106(1); Bell Decl. ¶ 9, Ex. 2, p.8 (confirming the Infringing ROMs were playable copies of the Nintendo Games). According to Mr. Storman's website, nearly 50,000 downloads of the Infringing ROMs occurred before this litigation was initiated. Bell Decl., Ex. 3, pp. 9-142.

Second, there is also no dispute that Mr. Storman knew of, encouraged, and materially contributed to this infringing activity. The vast majority of the content found on RomUniverse—which Mr. Storman boasted was the "best romsite in the universe"—consisted of pirated ROMs of Nintendo video games. Marcelo Decl., Ex. 7, p. 133. In fact, Mr. Storman notified RomUniverse users when new pirated ROMs were uploaded and even invited users to visit RomUniverse specifically to download pirated ROMs of games for Nintendo consoles. *See* Marcelo Decl., Ex.

-12-

10, p. 159; Ex. 16 p. 223; *see also* Ex. 1 pp. 76-77 at 73:23-74:2.  Even after this
litigation was initiated, Mr. Storman *continued* to distribute the Infringing ROMs
for more than a year and upload new infringing content through September 2020.
Knudson Decl. ¶ 7.

Moreover, Mr. Storman assisted users of RomUniverse in locating the
Infringing ROMs by labeling and cataloguing them using Nintendo's trademarks.
Marcelo Decl., Exs. 2, p. 104-111; Bell Decl., Ex. 3 p. 9-142.  And, when users
requested a specific Nintendo game, *Mr. Storman would personally locate pirated
ROMS of the requested game and upload it to RomUniverse*.  Marcelo Decl., Ex. 1,
pp. 90-92 at 87:25-89:4.  Mr. Storman not only knowingly assisted in this
infringement, he also directly profited from it by offering unlimited downloads of
illegal content for users who purchased Premium Memberships.  *Id.*, pp. 44-52 at
41:8-42:13; 48:3-49:17.

Such conduct, supported by undisputed evidence, satisfies the elements of
contributory copyright infringement as a matter of law.  *See A&M Records, Inc. v.
Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001) (finding contributory
infringement where defendant knew of availability of infringing files, assisted in
accessing the files, and failed to block access to the files); *Sega v. MAPHIA*, 948 F.
Supp. at 932-33; *Sega Enters Ltd. v. Sabella*, No. C 93-04260 CW, 1996 WL
780560, at *8 (N.D. Cal. Dec. 18, 1996).

### 2.    Vicarious Infringement

Similar to contributory infringement, to establish liability for vicarious
copyright infringement, Nintendo must establish that:  (1) the users of
RomUniverse infringed Nintendo's copyrights, (2) Mr. Storman had the right and
ability to supervise the infringing activity, and (3) Mr. Storman had a direct
financial interest in such activities.  *Fonovisa*, 76 F.3d at 262.

-13-

As discussed above, the first element is satisfied, because RomUniverse users infringe the Nintendo Games by downloading the Infringing ROMs. So, too, did any administrators that uploaded the Infringing ROMs to RomUniverse.

There is also no dispute regarding the second element. Mr. Storman admits that he had the right and ability to control the infringing actions of the RomUniverse users. Marcelo Decl., Ex. 1, pp. 43-44 at 40:19-41:7; *id.* pp. 98-100 at 95:9-97:14. He is the sole owner of RomUniverse and has the ability to change or control the content available on RomUniverse. *Id.*; *see also id.* p. 18 at 15:21-25. He also had the ability and authority to control the actions of RomUniverse administrators in connection with the content and functionality of RomUniverse. *Id.* Mr. Storman chose not to limit any of the infringing activities and added new infringing ROMs, including for over a year after Nintendo initiated this litigation. *Id.* pp. 98-100 at 95:9-97:14.

There is likewise no dispute that Nintendo has satisfied the third element. Mr. Storman did not act to prevent infringement on RomUniverse precisely because he directly profited from it. In fact, he testified that, until recently, his sole income was from sales of Premium Memberships. *Id.* p. 89 at 86:8-21. These Premium Memberships allowed users to download *more* infringing content at *faster* speeds. *Id.* pp. 44-45 at 41:8-42:13. And Mr. Storman promoted and marketed the availability of the Infringing ROMs to sell these Premium Memberships. *Id.* pp. 56-57 at 53:18-54:17; Marcelo Decl., Ex. 16, p. 223.

Because Mr. Storman had the right and ability to control the infringing actions of RomUniverse's users and administrators and because he directly profited from that infringement, Mr. Storman is vicariously liable for copyright infringement as a matter of law. *See Napster*, 239 F.3d at 1024.

**C.    Mr. Storman Is Liable for Trademark Infringement.**

A trademark owner establishes trademark infringement by showing: (1) that it owns a trademark; and (2) that the infringer (a) used the mark without

-14-

authorization, (b) in commerce, and (c) in a manner likely to create consumer confusion.  *See* 15 U.S.C. § 1114(1)(a); *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004); *Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F. Supp. 2d 1206, 1210 (C.D. Cal. 1998).

The undisputed evidence establishes each of the required elements of trademark infringement.

First, Nintendo registered each of the Nintendo Trademarks.  Knudson Decl., Ex. 3, pp. 143-221.  Such registrations constitute prima facie evidence of the validity of the Nintendo Trademarks, as well as of the facts stated in the registration certificates.  15 U.S.C. §1057(b); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).  These registrations are also prima facie evidence of Nintendo's exclusive right to the use of the marks for purposes of 15 U.S.C. § 1114(1).  *See* 15 U.S.C. § 1057(b); *Brookfield*, 174 F.3d at 1047.  Mr. Storman does not dispute Nintendo's ownership of these trademarks.  Marcelo Decl., Ex. 1 pp. 66-67 at 63:25-64:20.

Second, it is undisputed that Mr. Storman used the Nintendo Trademarks in commerce.  He trafficked in pirated ROMs of Nintendo games that, when played, contain and display the Nintendo Trademarks.  Bell Decl., Ex. 2, p. 8.  Mr. Storman also used the Nintendo Trademarks to identify and categorize the Infringing ROMs, including on the Nintendo Box Art, to assist users in efficiently navigating RomUniverse.  *Id.*, Ex.3, pp. 9-142; Knudson Decl., Ex. 5, p. 223.

Finally, Mr. Storman's use of the Nintendo Trademarks is likely to cause consumer confusion.  *Sega v. MAPHIA* is particularly analogous here.  In *Sega*, the defendant used Sega's trademarks on his website to identify pirated video games available for download, and when those pirated games were played, they displayed Sega's trademarks.  948 F. Supp. at 937.  The court held that the most relevant factors outlined in *AMF v. Sleekcraft* established a likelihood of confusion as a matter of law.  *Id.* at 938.  Specifically, the court found that the pirated video games

were substantially identical to the genuine games, the infringing marks were identical to the registered marks, and the defendant "used, or knowingly allowed others to use" the infringing marks.  *Id.* at 937-38.  Applying the same reasoning from *Sega v. MAPHIA* here, those factors establish a likelihood of confusion as to Mr. Storman's use of the Nintendo Trademarks as a matter of law.[10]  *Id.*; *see also* Section II(C), *supra*.

Like the defendant in *Sega*, Mr. Storman used the Nintendo Trademarks to identify the Infringing ROMs.  Marcelo Decl., Ex. 1, pp. 37-38 at 34:8-35:11; p. 92 at 89:19-22.  In fact, Mr. Storman uploaded much of the pirated content found on RomUniverse, believing he was uploading pirated copies of Nintendo games. Marcelo Decl., Ex. 1, pp. 39-42 at 36:20-39:18.  As in *Sega*, identical copies of the Nintendo Trademarks appear both on RomUniverse and on the title screens of the Infringing ROMs.  *See e.g.,* Bell Decl., Ex. 3, pp. 9-12.  Thus, "any member of the public that logged onto [RomUniverse]" or that played the Infringing ROMs was "likely to think that the trademark indicated that the games were sponsored by or affiliated with [Nintendo]."  *See Sega v. MAPHIA*, 948 F. Supp. at 938.

Moreover, because the Infringing Marks are counterfeit—*i.e.*, identical to the Nintendo Trademarks and used on the same goods—"[i]t is unnecessary to perform the step-by-step [*Sleekcraft* factor] examination ... because counterfeit marks are inherently confusing."  *China Cent. Television v. Create New Tech. (HK) Ltd.*, No. CV1501869 MMM (AJWx), 2015 WL 12732432, at *13 (C.D. Cal. Dec. 7, 2015).

Because Nintendo has established each of the elements of trademark infringement, it is entitled to summary judgment on this count as well.  For these same reasons, summary judgement should be granted regarding Nintendo's unfair competition claim under California law.  *See Moroccanoil, Inc. v. Groupon, Inc.*,

---

[10] Any remaining likelihood of confusion factors that are relevant here also support a finding of likelihood of confusion.  For instance, the Nintendo Trademarks are irrefutably strong and entitled to broad protection and the parties' marketing channels (the internet) are highly similar or identical.

278 F. Supp. 3d 1157, 1161 (C.D. Cal. 2017) ("When trademark and unfair competition claims are based on the same infringing conduct, courts apply the same analysis to both claims.").

**D.    Nintendo Is Entitled to Recover Statutory Damages Under Both the Copyright Act and the Lanham Act**

Both the Copyright Act and the Lanham Act allow a successful plaintiff to elect to recover an award of statutory damages.  A copyright owner may elect, at any time before final judgment is rendered, to recover "instead of actual damages and profits, an award of statutory damages for all infringements involved in the action."  17 U.S.C. § 504(c)(1).  The Copyright Act authorizes statutory damages of up to $30,000 per copyright infringed, enhanced to up to $150,000 per copyright if the infringement is willful.  17 U.S.C. § 504(c).  Similarly, in cases involving use of a counterfeit mark, such as here, a trademark owner may elect to recover an award of statutory damages of up to $200,000 per trademark infringed, enhanced to up to $2,000,000 per mark if the infringement is willful.  *See* 15 U.S.C. § 1117(c).

"The court has wide discretion in setting the amount of statutory damages under the Copyright Act."  *China Cent. Television*, 2015 WL 12732432, at *15 (citation and internal quotation marks omitted).  In determining the appropriate award, courts consider several factors including "the expenses saved and profits reaped by the infringer, the deterrent effect of the award on defendant and on third parties, and the infringer's state of mind in committing the infringement."  *Id.* There should be a "plausible relationship" between the statutory damages and the infringing conduct, considering evidence of the estimated revenue lost by the plaintiff and the profits garnered by the defendant.  *Id.* at *16.

Finally, when a defendant has infringed both trademarks and copyrights, a plaintiff is entitled to recover separate awards of statutory damages under both statutes.  Separate awards are appropriate because the Lanham Act and the Copyright Act provide separate remedies for the two distinct injuries and serve

-17-

different public policies.  *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) (a defendant commits "two wrongs" when his actions violate both the Copyright Act and the Lanham Act; to "effectuate the purposes of both statutes, damages may be awarded under both").

Because Mr. Storman's conduct violated both the Copyright Act and the Lanham Act, Nintendo is entitled to statutory damages under each act.

### E.  Nintendo Seeks $15,610,000 In Statutory Damages for Mr. Storman's Willful Infringement

Infringement is willful under the Copyright Act if the defendant "had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility."  *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir. 1999) (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993)); *see also In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008); *Sega v. MAPHIA*, 948 F. Supp. at 936.[11]  Similarly, in order to establish the level of willfulness necessary to warrant enhanced damages under the Lanham Act, a plaintiff need only show that the defendant acted with "willful blindness" to the trademark holder's rights.  15 U.S.C. §1117(b); *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007).

There is no doubt that Mr. Storman knew his conduct infringed Nintendo's copyrights.  *See* Section II, *supra*.  Not only did Mr. Storman himself upload infringing content to RomUniverse, but he first obtained those pirated games from other pirating websites and believed they were copies of Nintendo's games. Marcelo Decl., Ex. 1, p. 42 at 39:2-18; pp. 90-92 at 87:25-89:4.  He also knew RomUniverse used the Nintendo Trademarks.  *Id.* p. 92 at 89:19-22.  Additionally, he concedes that he received notices from Nintendo identifying several of the

---

[11] For purposes of willfulness under the Copyright Act, a defendant's knowledge of infringement may be constructive rather than actual—that is, the defendant's knowledge of infringement need not be proven directly, but may be inferred from the defendant's conduct such that reckless disregard of the copyright holder's rights suffices.  *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1010-11 (2d Cir. 1995).

150041242.12

1    Infringing ROMs as infringing Nintendo's copyrights, but failed to remove those

2    identified ROMs.  *Id*. pp. 70-71 at 67:15-68:25.[12]  Even after this litigation began,

3    Mr. Storman continued to distribute the Infringing ROMs for over a year.  In fact,

4    Mr. Storman added *new* infringing content to RomUniverse as recently as

5    September 2020, including recent releases for the Nintendo Switch.  Knudson Decl.

6    ¶ 7.  Such conduct is quintessential willful infringement.  *Sega v. MAPHIA*, 948 F.

7    Supp. at 936 (finding willful infringement where defendant allowed others to use

8    Sega's mark, upload and download Sega's games, and solicited others to upload

9    games, and financially benefitted from operating the website).

10        Based on Mr. Storman's trafficking in infringing Nintendo video games,

11    Nintendo seeks willful statutory damages of $400,000 for 28 non-cumulative

12    Nintendo Trademarks at issue[13] and $90,000 for each of the 49 copyrights at issue,

13    for a total of $15,610,000.

14        Nintendo recognizes this award is significant; however, so too, was Mr.

15    Storman's infringement.  While Nintendo's Complaint identifies 37 specific

16    copyrighted works as examples of Mr. Storman's infringement, RomUniverse

17    actually offered thousands of Nintendo's games for download, likely amassing

18    millions of illegal downloads of Nintendo's copyrighted works.  Given

---

[12] The URLs from the notices (Marcelo Decl., Exs. 17-18, pp. 225-26) are identical to those used to download the Infringing ROMs by Ms. Bell (Bell Decl., Ex. 2 p. 8 at 14-15).

[13] Exhibit B to Nintendo's Complaint provides 52 infringed trademarks.  Nintendo only seeks statutory damages regarding 28 of those marks:  ANIMAL CROSSING (Reg. No. 2,803,207) (*see* Bell Decl., Ex. 3 p. 9); ARMS (5,292,973) (*Id.* p. 137); CAPTAIN TOAD (4,774,095) (*Id.* p. 107); DONKEY KONG COUNTRY (Reg. 3,999,877) (*Id.* p. 16); KID ICARUS (1,494,364) (*Id.* p. 20); LUIGI'S MANSION (4,342,883) (*Id.* p. 24); Mario (design mark) (3,483,123) (*Id.* p. 112); MARIO BROS. (1,303,633) (*Id.* p. 91); MARIO KART (2,345,411) (*Id.* p. 28); MARIO PARTY (2,387,966) (*Id.* p. 140);  NINTENDO (1,497,674) (*Id.* p. 72); NINTENDO (word and design) (1,689,015) (*Id.* p. 78); NINTENDO 3DS (4,234,454) (*Id.* p. 17); NINTENDO DS (3,166,136) (*Id.* p. 58); SPLATOON (4,791,747) (*Id.* p. 114); STAR FOX (1,883,044) (*Id.* p. 36); SUPER MARIO (2,345,441) (*Id.* p. 69); SUPER MARIO 64 (2,319,991) (*Id.* p. 94); SUPER MARIO BROS. (2,345,410) (*Id.* p. 100); SUPER MARIO LAND (4,126,557) (*Id.* p. 72); SUPER MARIO ODYSSEY (5,525,632) (*Id.* p. 119); SUPER MARIO RUN (5,638,525) (*Id.* p. 52); SUPER MARIO WORLD (1,704,302) (*Id.* p. 52); THE ADVENTURE OF LINK (1,575,270) (*Id.* p. 104); THE LEGEND OF ZELDA (3,408,763) (*Id.* p. 88); THE LEGEND OF ZELDA MAJORA'S MASK (4,946,348) (*Id.* p. 48); THE LEGEND OF ZELDA A LINK TO THE PAST (1,742,389) (*Id.* p. 80); and WII (3,500,328) (*Id.* p. 142).

150041242.12

1  Mr. Storman's decade long infringement—*including distributing pirated copies of*

2  *Nintendo's new releases a year after this litigation began, despoiling key evidence,*

3  *and violating multiple Court orders*—an award of statutory damages in the lower

4  middle of the range available for willful infringement, as Nintendo requests here, is

5  reasonable and appropriate.[14]

6  These requested statutory damages are also "plausibly related" to Nintendo's

7  lost revenue (trebled for willfulness). The information provided by Mr. Storman's

8  own website—prior to his spoliation of it—indicated there were approximately

9  50,000 illegal downloads of the Infringing ROMs at the time the Complaint was

10  filed, more than a year before Mr. Storman disabled RomUniverse.[15]  Bell Decl.,

11  Ex. 3, p. 9-142.  The retail price for the Nintendo Games is between $20 and $60

12  per game, depending on the console.  Knudson Decl. ¶ 8.  Thus, based on the (pre-

13  spoliation) download data available for the 37 Infringing ROMs, Nintendo suffered

14  roughly $1,000,000 to $3,000,000 in lost revenue, which when trebled totals

15  $3,000,000 to $9,000,000.

16  **F.    Attorneys' Fees Are Warranted**

17  Both the Copyright Act and the Lanham Act authorize this Court to issue an

18  order that Nintendo is entitled to recover its reasonable costs and attorneys' fees.

19  Such an award is warranted under the circumstances here.

20  The Copyright Act authorizes the Court to award costs and attorneys' fees to

21  the prevailing party.  *See* 17 U.S.C. § 505.  A court may "freely award fees" to the

22  prevailing party as long as it "seek[s] to promote the Copyright Act's objectives,"

23

24      [14] *See Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1124 (C.D. Cal. 2007)
(awarding maximum statutory damages finding infringer was willfully blind as a matter of law)*;*

25  *To v. Nguyen*, No. SACV070989 JVS (ANx), 2008 WL 11340345, at *3 (C.D. Cal. May 28,
2008) (awarding maximum statutory damages to "deter future violations"); *BAOL, s.r.o. v. Media*

26  *W. Entm't, Inc.*, No. CV1110138 RGK (PJWx), 2012 WL 13012389, at *4 (C.D. Cal. June 26,
2012) (awarding statutory damages of $500,000 per trademark and $75,000 per copyright

27  infringed "given Defendants' pattern of infringement and the goal of deterrence").
    [15] The number of downloads grew well past 50,000, but such data was lost or destroyed by

28  Mr. Storman.

-20-

which is designed to encourage plaintiffs to act to protect their copyrights. *Historical Research v. Cabral*, 80 F.3d 377, 378-79 (9th Cir. 1996) (citing *Fogerty v. Fantasy Inc.*, 510 U.S. 517 (1994)).  Willful infringement is not a prerequisite for an award of attorneys' fees, and attorneys' fees are generally awarded to a prevailing plaintiff as a matter of course.  *Frank Music Corp. v. Metro-Goldwyn Mayer, Inc.*, 886 F.2d 1545, 1556 (9th Cir. 1989).

Nintendo is also entitled to its fees and costs under the Lanham Act.  The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party" and the "costs of the action."  15 U.S.C. § 1117(a).  Mr. Storman's deliberate and willful infringement, numerous delays in discovery, violations of the Court's orders, and spoliation makes this an "exceptional" case under the Lanham Act.  *See Playboy Enter., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982); *Zosma Ventures, Inc. v. Nazari*, No. CV121404 RSWL (FFMx), 2013 WL 12129643, at *4 (C.D. Cal. Sept. 23, 2013) (awarding attorneys' fees where defendant's bad faith during the litigation and willful infringement made case exceptional).

In cases involving the mass distribution of infringing works, courts have also routinely awarded costs and attorneys' fees.  *See, e.g., Philip Morris*, 489 F. Supp. 2d at 1124; *Sega v. MAPHIA*, 948 F. Supp. at 941.  Upon a favorable ruling on its Motion, Nintendo will submit a declaration in support of its request for reasonable attorneys' fees and costs in prosecuting this action.

## G. Permanent Injunction Is Warranted And Necessary

Permanent injunctions are available under both the Copyright Act and the Lanham Act.  See 17 U.S.C. § 502(a); 15 U.S.C. §§ 1116(a) and 1125(c)(1). Courts apply a four-factor test in determining whether to grant an injunction.  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Microsoft Corp. v. Buy More, Inc.*, 136 F. Supp. 3d 1148, 1158 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476 (9th Cir. 2017).  Specifically, courts examine whether (1) the plaintiff has suffered

-21-

irreparable injury; (2) there is an adequate remedy at law; (3) a remedy in equity is warranted, considering the balance of hardships between the plaintiff and the defendant; and (4) it is in the public's interest to issue the injunction. *Id.*

"Although, post-*eBay*, a court may no longer presume irreparable injury from the bare fact of liability in a trademark or trade dress case, the injury caused by the presence of infringing products in the market—such as lost profits and customers, as well as damage to goodwill and business reputation—will often constitute irreparable injury." *Sennheiser Elec. Corp. v. Eichler*, No. CV 12-10809 MMM (PLAx), 2013 WL 3811775, at *10 (C.D. Cal. July 19, 2013). Because it is undisputed that RomUniverse distributed at least tens of thousands of illegal copies of Nintendo games, bearing counterfeit marks and separately infringing Nintendo's copyrights, Nintendo has suffered irreparable injury including lost customers and damage to its goodwill and business reputation. *See id.; see also* Knudson Decl. ¶ 9. Moreover, Mr. Storman's willful actions before and during this litigation provide "no assurance that [he] will refrain from further infringement, absent a permanent injunction." *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1239 (E.D. Cal. 2008); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) ("As a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations."). Thus, the first two factors weigh in favor of granting a permanent injunction.

The third and fourth factors likewise weigh in favor of granting a permanent injunction. Regarding the balance of hardships, "an injunction will merely assure [Mr. Storman's] compliance with the Lanham Act and other laws governing trademark infringement and unfair competition." *Sennheiser*, 2013 WL 3811775 at *11; *see also Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) ("[i]f the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [the plaintiff] substantial protection of its trademark"). Finally, the public interest is served by upholding the rights provided

1    under the Copyright Act and Lanham Act.  *Sennheiser*, 2013 WL 3811775 at *11;

2    *Buy More, Inc*., 136 F. Supp. 3d at 1159.

3           Because Mr. Storman's repeated and mass infringement of the Nintendo IP is

4    beyond dispute, including after the initiation of this litigation, Nintendo is justified

5    in inferring a threat of future harm.  Accordingly, the Court should enter the

6    accompanying proposed permanent injunction to prevent any future infringement of

7    the Nintendo IP.

8    **H.     Mr. Storman's Counterclaim(s) Should Be Dismissed**

9           Although Mr. Storman purportedly alleges an unspecified counterclaim, Dkt.

10   No. 33 at 6, when asked at deposition, he could not identify any specific

11   counterclaims and could only question whether the Infringing ROMs were

12   "playable."  Marcelo Decl., Ex. 1, pp. 93-94 at 90:16-91:7.  If anything, Mr.

13   Storman is articulating a potential defense (which fails, because Nintendo

14   confirmed that the Infringing ROMs are playable (*see* Bell Decl., Ex. 2)).

15   Summary judgment should be granted regarding any counterclaims Mr. Storman

16   may be asserting.

17   **I.      Mr. Storman Despoiled Key Evidence**

18          Nintendo seeks an adverse inference regarding Mr. Storman's failure to

19   preserve evidence consisting of:  (1) data from RomUniverse showing the number

20   of times each Infringing ROM was downloaded, and (2) Mr. Storman's

21   communications regarding Nintendo, RomUniverse, or this litigation.  The court

22   may issue an adverse inference instruction where a party destroyed evidence and

23   "(1) the party having control over the evidence had an obligation to preserve it; (2)

24   the records were destroyed with a culpable state of mind; and (3) the destroyed

25   evidence was relevant to the party's claim or defense."  *World Courier v. Barone*,

26   No. C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007) (imposing

27   adverse inference where defendant's husband destroyed relevant evidence).  A

28   culpable state of mind requires only negligent spoliation to issue an adverse

-23-

1    inference. *Id.* at \*2. Here, Mr. Storman either concedes or there is no dispute that

2    each of the required elements to issue an adverse inference instruction are met.

3         ***First***, Mr. Storman was on notice as to the relevance of the destroyed

4    evidence since Nintendo filed its Complaint (September 10, 2019), and certainly no

5    later than April 2020, when Nintendo first propounded discovery requests for it (as

6    well as the numerous times Nintendo subsequently requested that Mr. Storman

7    produce it).  Marcelo Decl. ¶¶ 2-3; *see Section* II(D), *supra*.  After Mr. Storman's

8    refusal to produce the evidence or to even confer about his refusal, Nintendo was

9    forced to seek the Court's intervention.  *Id.*  The Court not only ordered Mr.

10   Storman to produce the requested information but also explicitly reminded Mr.

11   Storman that he could be sanctioned for failing to comply.  *See* Dkt. No. 49

12   (warning Mr. Storman of potential monetary sanctions and adverse inferences).

13   Just days before the Court-ordered deadline to produce the evidence, Mr. Storman

14   confirmed that it was still available, and he was "on track" to produce it.  Marcelo

15   Decl. ¶ 3.  Instead, he ignored the Court's deadline and "procrastinated" until the

16   evidence was no longer available.  *Id.* pp. 78-82 at 75:18-79:8.

17        ***Second***, Mr. Storman was "at least negligent, and more likely knowingly

18   willful, in failing to prevent the spoliation of relevant evidence[.]"  *World Courier*,

19   2007 WL 1119196, at \*2.  Mr. Storman concedes that he was negligent in

20   preserving the evidence, testifying that he missed the deadline to produce the

21   evidence because he "procrastinated."  Marcelo Decl., Ex. 1 pp. 78-82 at 75:18-

22   79:8.  He offers no explanation beyond "coincidence" as to how evidence

23   simultaneously disappeared from two separate online accounts that he controlled—

24   *including his own website*—serviced by two completely different internet service

25   providers, mere *days* before he was ordered to produce it.  Marcelo Decl., Ex. 1 pp.

26   78-82 at 75:18-79:8; pp. 63-64 at 60:7:61:2.  Respectfully, this strains credulity.

27   Mr. Storman's negligence is sufficient to issue the requested adverse inference; the

28   circumstances here underscore his bad faith.

**Third,** there is no dispute that the destroyed evidence was relevant. The information regarding the number of times each of the Infringing ROMs was downloaded is highly relevant to Nintendo's damages. *See* Section III(E), *supra*. And Mr. Storman testified that his now-lost communications included direct messages with RomUniverse administrators about Nintendo, RomUniverse, and this litigation. Marcelo Decl., Ex. 1, pp. 22-26 at 19:11-20:3; 21:13-23:13. The loss of this evidence prejudices Nintendo's ability to establish its full measure of damages and to investigate the scope of Mr. Storman's, or his co-conspirators', infringement.

Because Nintendo has established each of the required elements, given Mr. Storman's disregard for and violation of the Court's Orders, and to rectify the prejudice caused, Nintendo respectfully requests an adverse inference that the destroyed evidence was unfavorable to Mr. Storman.[16]

## IV.   CONCLUSION

Because it is undisputed that Mr. Storman directly, contributorily, and vicariously infringed Nintendo's copyrights, and because it is undisputed that Mr. Storman infringed Nintendo's trademarks in perpetrating this infringement, the Court should grant summary judgment for Nintendo on its affirmative claims and dismiss any counterclaims articulated by Mr. Storman. Additionally, because Mr. Storman destroyed highly relevant evidence, the Court should enter an adverse inference that the destroyed evidence was unfavorable to Mr. Storman.

---

[16] Nintendo is also seeking modest monetary sanctions of $9,300 in attorney's fees expended in connection with these and related discovery violations. *See* Dkt. No. 51. Mr. Storman did not file a response, and the Court has not issued an order. Awarding these fees in the alternative as sanctions for spoliation would also be appropriate. *See Mfg. Automation & Software Sys., Inc. v. Hughes*, No. CV 16-8962 CAS (KSX), 2018 WL 5914235, at *7 (C.D. Cal. Sept. 18, 2018) (awarding $41,129.38 in attorney's fees related to spoliation).

150041242.12

1     DATED:  December 29, 2020          **PERKINS COIE LLP**

2

3                                        By: */s/ Katherine M. Dugdale*
                                              Katherine M. Dugdale
4                                             William C. Rava (appearing *pro hac vice*)
                                              Christian W. Marcelo (appearing *pro hac vice*)
5

6                                        Attorneys for Plaintiff
                                         NINTENDO OF AMERICA INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

150041242.12