1  Katherine M. Dugdale, Bar No. 168014
   KDugdale@perkinscoie.com
2  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
3  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
4  Facsimile:  310.788.3399

5  William C. Rava (appearing *pro hac vice*)
   Christian W. Marcelo (appearing *pro hac vice*)
6  WRava@perkinscoie.com
   CMarcelo@perkinscoie.com
7  PERKINS COIE LLP
   1201 Third Avenue, Suite 4900
8  Seattle, WA  98101
   Telephone:  206.359.8000
9  Facsimile:  206.359.9000

10 Attorneys for Plaintiff
   Nintendo of America Inc.

11

                    UNITED STATES DISTRICT COURT
12
                   CENTRAL DISTRICT OF CALIFORNIA
13

14

15 | NINTENDO OF AMERICA INC., a Washington corporation | Case No. 2:19-CV-07818-CBM-RAO |
|---|---|
16 | Plaintiff, | **NINTENDO'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
17 | v. | |
18 | MATTHEW STORMAN, an individual, JOHN DOES 1-10, individuals and/or corporations, | Date: TBD |
19 | | Time: TBD |
   | | Ctrm: TBD |
20 | Defendant. | The Honorable Consuelo B. Marshall |

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................. 1

II. BACKGROUND .................................................................................................. 2

III. ARGUMENT ....................................................................................................... 4

    A. Trademarks Protect Digital Goods .......................................................... 4

    B. *Dastar* and *Slep-Tone* Do Not Bar Nintendo's Trademark Claims .................................................................................................... 5

        1. *Dastar* Does Not Bar Nintendo's Trademark Claims ................. 5

        2. *Slep-Tone* Does Not Bar Nintendo's Trademark Claims ........... 7

IV. CONCLUSION .................................................................................................... 9

- i -

LEGAL151896185.7

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*China Cent. Television v. Create New Tech. HK Ltd.*,
No. 215CV01869SVWAJW, 2016 WL 11647218 (C.D. Cal. Nov.
7, 2016) .................................................................................................................4

*Craigslist Inc. v. 3Taps Inc.*,
942 F. Supp. 2d 962 (N.D. Cal. 2013)...................................................................7

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) .........................................................................................passim

*Microsoft Corp. v. Rivera*,
No. 217CV07027ODWJPRX, 2019 WL 1641349 (C.D. Cal. Apr.
16, 2019) ..............................................................................................................4

*Sambonet Paderno Industrie, S.P.A. v. Sur La Table, Inc.*,
No. CV 14-9473 FMO (RZX), 2015 WL 4498795 (C.D. Cal. July
23, 2015) ...............................................................................................................6

*Sega Enterprises Ltd. v. MAPHIA*,
857 F. Supp. 679 (N.D. Cal. 1994)........................................................................5

*Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs.*,
*LLC*,
825 F.3d 1246 (9th Cir. 2017) .........................................................................passim

*Williams v. Cavalli*,
No. CV 14-06659-AB JEMX, 2015 WL 1247065 (C.D. Cal. Feb.
12, 2015) ...............................................................................................................7

- ii -

# I.    INTRODUCTION

Copyright and trademark laws protect from different wrongs.  Mr. Storman violated both, repeatedly.  He copied hundreds of Nintendo's copyrighted works and then distributed hundreds of thousands of those pirated copies.  Those actions violated the Copyright Act.  He also used the Nintendo Trademarks to promote and facilitate the sale of those pirated copies, including by:

- incorporating the Nintendo Trademarks in promotional communications touting his pirated copies of Nintendo games offered on RomUniverse;

- incorporating the Nintendo Trademarks to organize and identify the pirated copies of Nintendo games on RomUniverse to facilitate users' ability to locate and download those pirated copies;

- posting Nintendo box art, which features Nintendo Trademarks, to promote particular pirated copies of Nintendo games on RomUniverse;

- incorporating the Nintendo Trademarks in the file names of the pirated copies of Nintendo games sold through RomUniverse; and

- incorporating the Nintendo Trademarks in the content of the pirated copies of Nintendo games sold through RomUniverse.

Thus, consumers who searched for and then ultimately downloaded the Infringing ROMs from Mr. Storman's website encountered the Nintendo Trademarks at every step—in advertising communications, throughout the website, in the file names, and in the title scenes of the pirated games.  These facts are undisputed, and those actions violate the Lanham Act.

Neither the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, nor the Ninth Circuit's in *Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC* bars Nintendo's trademark infringement claims.  Nintendo's motion for summary judgment should be granted.

## II.    BACKGROUND

For over forty years, Nintendo has been developing, marketing, and distributing electronic video game hardware, software, and related accessories. Consumers can purchase Nintendo's video games either as tangible cartridges, or digital copies through Nintendo's eShop:  https://www.nintendo.com/games/buy-digital/.  To purchase the digital copies, consumers search through Nintendo's online catalog of video games, encountering the Nintendo Trademarks throughout the process.  In Nintendo's eShop, for instance, the video games are organized by console, are identified by the game's name, and feature promotional images of the video games.  When playing the purchased digital game, consumers see a series of title screens featuring the Nintendo Trademarks and confirming the games as genuine Nintendo games.

Mr. Storman has spent the last decade—*including during the year after this litigation began*—also distributing copies of Nintendo's video games through RomUniverse.  But, of course, he was distributing pirated ROMs.  These pirated ROMs are not perfect copies of Nintendo's genuine games, or have been purposely modified.  For instance, as Ms. Bell noted in her investigation, the download of "Mario Bros." from RomUniverse downloaded an archive of "55 files, with 35 labeled as different "Mario Bros Hacks" and 20 labeled as different versions of Mario Bros."  Dkt. No. 52-2 ("Bell Decl."), Ex. 2, p. 8.

To attract users and purchasers to RomUniverse, from which he sold the pirated ROMs, Mr. Storman repeatedly utilized the Nintendo Trademarks.[1]  He used the Nintendo Trademarks to promote RomUniverse and encourage users to download the pirated ROMs.[2]  *See e.g.*, Dkt. No. 52-04 ("Knudson Decl."), Ex. 4

---

[1] While Mr. Storman infringed hundreds of Nintendo's trademarks, Nintendo identified 52 such trademarks for purposes of this litigation and seeks statutory damages for 28.  Motion at 19.

[2] Magistrate Judge Oliver ordered Mr. Storman to produce his communications regarding RomUniverse.  In violation of the Court's order, Mr. Storman failed to produce, and destroyed, such communications.  The communications Nintendo was able to preserve demonstrate that those deleted

-2-

1   (notifications updating users when new pirated content was uploaded to

2   RomUniverse).





9   He organized the pirated ROMs on RomUniverse using the Nintendo Trademarks.

10  *Id.*, Ex. 5; 12/29/20 Marcelo Decl., Ex. 4 p. 117.





17  And, in many cases, he used Nintendo's box art—which featured the Nintendo

18  Trademarks—to promote the pirated ROMs.  *See e.g.,* Bell Decl., Ex. 3 p. 25.





25      Even the file names for the pirated ROMs, which users see when

26  downloading the files, incorporated the Nintendo Trademarks.  *See e.g.*, Bell Decl.,

27

28  communications would have further supported Nintendo's trademark infringement claims.  As detailed in
    its Motion, Nintendo is entitled to an inference to that effect.

-3-

1    Ex. 2 (notes column regarding file titled:  "Zelda II - The Adventure of Link (U)

2    [b5].nes.").  Finally, when the pirated ROMs were played, several featured the same

3    title screens as Nintendo's authorized games, falsely identifying Nintendo as the

4    source of those pirated copies.  Bell Decl., Ex. 3.

  

### III.    ARGUMENT

11       The Court's March 17, 2021 Order requested additional information

12   regarding whether Nintendo "has a cognizable trademark infringement claim in

13   light of *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003),

14   and *Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845

15   F.3d 1246 (9th Cir. 2017)."  The answer is a resounding "yes."  Neither case bars

16   Nintendo's trademark infringement claims.

### A.    Trademarks Protect Digital Goods

18       As an initial matter, courts have routinely applied trademark protections to

19   digital goods like Nintendo's video games, including where infringers use

20   trademarks to promote the digital goods and, within the good, to falsely indicate the

21   good's authenticity.  *See e.g., Microsoft Corp. v. Rivera*, No.

22   217CV07027ODWJPRX, 2019 WL 1641349, at *4 (C.D. Cal. Apr. 16, 2019)

23   (finding trademark infringement where defendant made counterfeit copies of

24   Microsoft software available for download using "Microsoft trademarks to

25   advertise and promote the sale of counterfeit Microsoft products"); *China Cent.*

26   *Television v. Create New Tech. HK Ltd.*, No. 215CV01869SVWAJW, 2016 WL

27   11647218, at *3 (C.D. Cal. Nov. 7, 2016) (finding trademark infringement where

28   defendant streamed copyrighted TV programming including the plaintiffs'

-4-

1    trademarks in the stream and used "plaintiffs' trademarks in advertising and

2    promotional materials" for the programming); *Sega Enterprises Ltd. v. MAPHIA*,

3    857 F. Supp. 679, 688 (N.D. Cal. 1994) ("Defendant's use of Sega's trademark on

4    its files sections and file descriptors, and on programs made available and

5    encouraged for downloading … constitutes trademark infringement under the

6    Lanham Act.").

7         Here, there can be no question that Mr. Storman's repeated use of the

8    Nintendo Trademarks—across numerous platforms and media and all to promote

9    and facilitate his sale of pirated ROMs—violates the Lanham Act.

10   **B.    *Dastar* and *Slep-Tone* Do Not Bar Nintendo's Trademark Claims**

11        Based on the undisputed facts presented in Nintendo's Motion, *Dastar* and

12   *Slep-Tone* are distinguishable and inapplicable.

13        **1.    *Dastar* Does Not Bar Nintendo's Trademark Claims**

14        In *Dastar*, the defendant, Dastar Corporation, released a set of videotapes

15   constructed from video content in the public domain.  *Dastar*, 539 U.S. at 27.

16   DaStar sold the videotapes, branded as its own product.  *Id.*  The plaintiffs alleged

17   that Dastar's failure to credit the underlying source material violated § 43(a) of the

18   Lanham Act under the theory of "reverse passing off," claiming Dastar falsely

19   asserted itself as the origin of the source material.  *Id.* at 28.  The Supreme Court

20   rejected this argument, holding that when § 43(a) of the Lanham Act refers to "false

21   designation of origin," it refers to the producer or manufacturer of the goods at

22   issue, not the source of the content found in the work.  *Id*. at 37.  Because Dastar

23   produced the videotapes, the Court held that Dastar was the true "origin" of the

24   videotapes and therefore there could be no confusion as to the origin of those

25   videotapes.  *Id.*

26        Several key facts distinguish *Dastar* from this case.  First, unlike in *Dastar*,

27   this is not a case of "reverse passing off."  In *Dastar*, the defendant never used the

28   plaintiff's trademark.  Here, on the other hand, Mr. Storman repeatedly used the

-5-

1   Nintendo Trademarks to promote, organize, and identify pirated ROMs of

2   thousands of Nintendo's games.  Indeed, at every step of the consumer experience

3   obtaining the Infringing ROMs from RomUniverse, consumers were confronted

4   with one or more of the Nintendo Trademarks.  *See*, Section II, *supra*.

5   Mr. Storman's repeated use of the Nintendo Trademarks is thus likely to cause

6   confusion as to whether the Infringing ROMs are genuine copies of Nintendo's

7   games, and whether Nintendo has authorized or is affiliated with RomUniverse.

8          Second, the defendant in *Dastar* created its own product, used works in the

9   public domain as its source material, and claimed credit for this creation.  *Dastar* at

10  37.  Thus, the defendant accurately denoted the origin of its product.  *Id.*  Not so

11  here.  Despite Mr. Storman's repeated use of the Nintendo Trademarks in

12  promoting and distributing the Infringing ROMs, they are not genuine versions of

13  Nintendo's video games.  Moreover, many of them appear to have been altered or

14  "hacked"[3] versions, and Nintendo has no ability to control the quality of the

15  Infringing ROMs.  Mr. Storman's use of the Nintendo Trademarks in connection

16  with the Infringing ROMs falsely identifies Nintendo as the origin of the goods.

17  *See Sambonet Paderno Industrie, S.P.A. v. Sur La Table, Inc.*, No. CV 14-9473

18  FMO (RZX), 2015 WL 4498795, at *6 (C.D. Cal. July 23, 2015) (denying

19  dismissal of trademark claim distinguishing from *Dastar* because "in *Dastar*, and in

20  cases like it, there was no express or implied suggestion that the product in question

21  emanated from anyone other than the entity that produced it.").

22         Finally, while the *Dastar* court noted that "in construing the Lanham Act, we

23  have been careful to caution against misuse or over-extension of trademark and

24  related protections into areas traditionally occupied by patent or copyright," 539

25  U.S. at 34, some acts of copying can still constitute both trademark and copyright

26  infringement.  For instance, where a defendant uses a work that is both protected by

27

28
---
[3] "Hacked" in connection with video games generally connotes a game that has been modified from its original version.

-6-

1  copyright and contains a source identifier, displaying the work may infringe both

2  rights.  *See Williams v. Cavalli*, No. CV 14-06659-AB JEMX, 2015 WL 1247065,

3  at *5 (C.D. Cal. Feb. 12, 2015) ("When Defendants placed images of the mural

4  onto items in the Collection, they not only appropriated Plaintiffs' copyrighted

5  mural, but also used Chapa's source-identifying imagery.  Thus … Defendants' one

6  act of copying simultaneously infringed on Plaintiffs' copyright and [trade dress]");

7  *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 979–80 (N.D. Cal. 2013) ("it

8  does not follow from *Dastar* that [defendant] is free to use Craigslist's trademark in

9  an allegedly misleading way simply because the mark is contained in Craigslist's

10  copyrighted (or copyrightable) work").

11       Of course, Mr. Storman's infringement of the Nintendo Trademarks goes

12  well beyond simply making a copy of Nintendo's copyrighted works.  As described

13  *supra*, in addition to distributing pirated ROMs which contained the Nintendo

14  Trademarks within the games, Mr. Storman also repeatedly used the Nintendo

15  Trademarks to promote and facilitate the download of those Infringing ROMs.

16  These wrongs are separate and distinct from his infringement of Nintendo's

17  copyrights.  *See Craigslist*, 942 F. Supp. 2d at 980 (holding that *Dastar* did not bar

18  trademark claim because "although Craigslist does allege trademark violations

19  stemming from use of the "craigslist" mark within copyrighted content . . .

20  Craigslist also alleges unauthorized use of its mark in other contexts" including

21  promotional materials and throughout the defendant's website).

22       For all the above reasons, Nintendo's trademark claims are not impacted by

23  the holding of *Dastar*.

24       **2.    *Slep-Tone* Does Not Bar Nintendo's Trademark Claims**

25       In *Slep-Tone*, the Ninth Circuit Court of Appeals applied the holding of

26  *Dastar* to affirm the dismissal of a trademark infringement claim.  *Slep-Tone*, 845

27  F.3d 1246.  The plaintiff in *Slep-Tone* was a producer of karaoke music tracks

28  which it compiled and released on compact discs.  *Id.* at 1247-48.  When played,

-7-

LEGAL151896185.7

1    the tracks showed the lyrics to various songs and displayed the plaintiff's

2    trademark. *Id.* at 1248. The plaintiff alleged that the defendants, who operated a

3    karaoke business, performed tracks taken from the plaintiff's CDs. *Id.* Notably, the

4    defendants did not sell or distribute the digital tracks, merely *performing* them for

5    consumers. *Id.* at 1250. The plaintiff alleged that "because the media-shifted files

6    display Plaintiff's trademarks and trade dress when performed, consumers will be

7    confused about their origin—believing that the tracks originated with Plaintiff,

8    rather than with Defendants."[4] *Id.* at 1249.

9        Applying the reasoning from *Dastar*, the *Slep-Tone* court focused on what

10   the relevant "goods" at issue were and whether consumers might be confused as to

11   the origin of those goods, holding that the "goods" at issue were the digital tracks

12   copied from the plaintiff's compact disc. *Id.* at 1250. And, because "*[c]onsumers*

13   *never see the digital files* and *Defendants neither sell them* nor make representation

14   about their source medium," the court reasoned that consumers would not be

15   confused as to the origin of the digital tracks and affirmed the dismissal of the

16   plaintiff's trademark claims. *Id.* (emphasis added).

17       Like *Dastar*, the core logic of *Slep-Tone* does not apply here. Whereas the

18   *Slep-Tone* court focused on the lack of consumer sales of the digital files and that

19   consumers never saw them, here Mr. Storman *distributed* hundreds of thousands of

20   digital files, allowing consumers to download pirated ROMs. Thus, unlike the

21   consumers in *Slep-Tone*, the consumers here both viewed and possessed the digital

22   files at issue, which falsely attribute the Infringing ROMs—along with any

23   modifications, defects or bugs contained in the copies—to Nintendo.

24       And again, Mr. Storman's use of the Nintendo Trademarks was not, as in

25   *Slep-Tone*, limited to within the digital files. Mr. Storman also used the Nintendo

26

27   _____

     [4] "Media-shifting" generally refers to making a copy from a lawfully-owned original into a
     different form of media for personal use. Mr. Storman was not "media-shifting" because there is no
     evidence in the record that he owns any original media containing the Nintendo games and the purpose of
28   the copying was not personal use but instead selling the copies for profit.

                                              -8-

1    Trademarks to advertise RomUniverse, promote the download of the pirated

2    ROMs, and facilitate the download of the pirated ROMs by organizing them to

3    allow consumers to more easily search and locate their desired ROM.  In fact, even

4    the goods at issue—the Infringing ROM files—contained the Nintendo Trademarks

5    in the file names.  There is no question that consumers repeatedly encountered the

6    Nintendo Trademarks in locating, downloading, and playing the Infringing ROMs,

7    creating a significant likelihood of confusion as to the authenticity and origin of the

8    Infringing ROMs, and Nintendo's affiliation with or authorization of RomUniverse.

## IV.   CONCLUSION

10       Mr. Storman's infringement of Nintendo's trademarks is a separate and

11   distinct harm from his infringement of Nintendo's copyrighted works.  And neither

12   *Dastar* or *Slep-Tone* bar Nintendo's trademark claims on the undisputed facts of

13   repeated trademark use presented here.  Nintendo thus respectfully requests

14   summary judgment in its favor on its claim for trademark infringement.

16    DATED:  March 25, 2021          **PERKINS COIE LLP**

17                                    By:*/s/ Katherine M. Dugdale*
18                                        Katherine M. Dugdale
                                         William C. Rava (appearing *pro hac vice*)
19                                       Christian W. Marcelo (appearing *pro hac vice*)

                                      Attorneys for Plaintiff
21                                    NINTENDO OF AMERICA INC.

-9-

LEGAL151896185.7